IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LYNN NOYES, | ) | |
| | ) | |
| Plaintiff, | ) | 2:02-cv-2685-GEB-CMK |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| KELLY SERVICES, INC., | ) | |
| a corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

On April 21, 2008, Defendant Kelly Services, Inc. ("Kelly") filed a renewed motion for judgment as a matter of law or in the alternative for a new trial under Federal Rules of Civil Procedure 50(b) and 59.[1]  Plaintiff Lynn Noyes ("Noyes") opposes the motion. Oral argument was heard on June 16, 2008, on the issues whether Noyes presented sufficient evidence of ratification by a Kelly officer of the decision not to promote Noyes and whether the jury's punitive damages verdict against Kelly is unconstitutionally excessive.  The remaining issues raised by Kelly's motion were determined suitable for decision without oral argument under Local Rule 78-230(h).

_____

[1]     Subsequent references to Rules are to the Federal Rules of Civil Procedure unless otherwise noted.

BACKGROUND

Noyes prevailed at trial in this action on her claims that she did not receive a promotion due to religious discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the California Fair Employment and Housing Act ("FEHA"), California Government Code sections 12900 *et seq.*, when she was passed over for a promotion because she was not a member of a group called the Fellowship of Friends ("the Fellowship").  Noyes worked at Kelly's software and multimedia department in Nevada City, California from October 1994 until May 2004.  In April 2001, the position of Software Development Manager became available.  William Heinz ("Heinz"), a top-level manager at Kelly and a member the Fellowship hired Joep Jilesen ("Jilesen"), another member of the Fellowship, for the position.

The jury returned a special verdict for Noyes on both claims, finding that Noyes's lack of certain religious beliefs was a motivating factor for why she was not selected for the position. (Jury Verdict ¶ 1, Apr. 4, 2008.)  The jury also found by clear and convincing evidence that an officer, director or managing agent of Kelly had advance knowledge of conduct constituting malice, fraud or oppression concerning the failure to promote decision and adopted or approved of a religious discrimination promotion expressly or by failure to act.  (Id. ¶¶ 3-4.)  The jury awarded Noyes $147,174 in economic damages, $500,000 in emotional distress damages, and $5.9 million in punitive damages.

STANDARDS OF REVIEW FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for

that party on that issue.'" <u>Reeves v. Sanderson Plumbing Prods.,</u>

<u>Inc.</u>, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). "In

[reviewing the evidence], the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." <u>Id.</u> at 150.

> [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

<u>Id.</u> at 151 (internal quotation marks and citation omitted).

A new trial may be granted under Rule 59 if the verdict is

contrary to the clear weight of the evidence. <u>Passantino v. Johnson &</u>

<u>Johnson Consumer Prods., Inc.</u>, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

> [T]he district court has "the duty . . . to weigh the evidence as [the court] saw it, and . . . set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence."

<u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007) (quoting

<u>Murphy v. City of Long Beach</u>, 914 F.2d 183, 187 (9th Cir. 1990)).  The

court does not have to weigh the evidence under Rule 59 in the light

most favorable to the prevailing party. <u>Landes Constr. Co. v. Royal</u>

<u>Bank of Can.</u>, 833 F.2d 1365, 1371 (9th Cir. 1987).  A new trial should

be granted under Rule 59 where the court "is left with the definite

and firm conviction that a mistake has been committed." <u>Id.</u> at 1371-

72.

Rule 59 also authorizes the trial judge to grant a new trial

because of erroneous jury instructions. <u>Murphy</u>, 914 F.2d at 186-87 &

1  n.5; <u>Cleveland v. S. Pac. Co.</u>, 436 F.2d 77, 80-81 (9th Cir. 1970).

2  But an erroneous instruction is not a "ground for granting a new trial

3  . . . unless [a new trial is necessary to achieve] substantial

4  justice.  At every stage of the proceeding, the court must disregard

5  all errors and defects that do not affect any party's substantial

6  rights."  Fed. R. Civ. P. 61; <u>see also</u> <u>McDonough Power Equip., Inc. v.</u>

7  <u>Greenwood</u>, 464 U.S. 548, 553 (1984) ("[C]ourts should exercise

8  judgment . . . and ignore errors that do not affect the essential

9  fairness of the trial.").

10                              <u>ANALYSIS</u>

11 <u>I. Judgment as a Matter of Law</u>

12      <u>A. Evidence That the Fellowship Was a Religion to Heinz</u>

13          Kelly argues "Noyes failed to present sufficient evidence

14 that the Fellowship was a religion to William Heinz, the alleged

15 decisionmaker."  (Mot. at 3:6-11 (citing <u>O'Quinn v. Raley's</u>, 2008 WL

16 686894, at *3 (E.D. Cal. Mar. 12, 2008)).)  Noyes contends since this

17 is a case of reverse religious discrimination "[t]he personal beliefs

18 of Mr. Heinz are not determinative" and instead the issue is "whether

19 or not the Fellowship of Friends is a religion."  (Opp'n at 2:2-9.)

20          The jury could have reasonably inferred from the evidence

21 that the Fellowship was a religion to Heinz and could have rejected

22 the credibility of Heinz's testimony that the Fellowship was not a

23 religion to him.  Heinz testified that he was a member of the

24 Fellowship from 1976 until March of 2007 and served on the board of

25 directors of the Fellowship for a year in 1997.  (Trial Tr., 106:2-15,

26 Apr. 3, 2008.)  Noyes also presented sufficient evidence establishing

27 that the Fellowship is a religion.  Accordingly, the jury could have

28 reasonably inferred that the Fellowship was a religion to Heinz.

B.  Evidence That Kelly Knew the Fellowship Was a Religion

Kelly argues Noyes failed to present evidence that "Kelly knew the Fellowship was a religion." (Mot. at 3:17-19 (emphasis omitted) (citing Lewis v. United Parcel Serv., Inc., 2005 WL 2596448, at *7 (N.D. Cal. Oct. 13, 2005) (granting summary judgment on FEHA religious discrimination claim where plaintiff presented no evidence employer was aware of religious practices or beliefs); Aguirre v. Chula Vista Sanitary Serv., 542 F.2d 779, 781 (9th Cir. 1976) ("A showing by plaintiff that he was discharged following protected activities of which the employer was aware establishes a prima facie case of retaliatory dismissal [under Title VII].")).)  Kelly further argues that "Kelly's Senior Vice President for Human Resources, Nina Ramsey, testified that Kelly did not know the Fellowship was a religion and, after investigating, concluded it was more of a social group." (Id. at 4:15-18.)  Noyes counters she presented evidence "that as far back as 1998 [when Jeff Boswell, a former employee, discussed favoritism shown the Fellowship members in his exit interview] Kelly Corporate had been told about the religious nature of the Fellowship of Friends.  Kelly knew, or should have known [based on information readily available on the internet, and an anonymous letter], that the Fellowship was a religion years before the promotion underlying this case." (Opp'n at 3:5-4:10; Trial Tr. 84:2-3 & 10-11, 85:1-5, Mar. 25, 2008 (testimony of Jeff Boswell).)

Under Title VII and FEHA, "employers [are] liable for discrimination by their supervisory employees." Janken v. GM Hughes Elecs., 46 Cal. App. 4th 55, 67 (1996).  Here, Heinz was a supervisory employee of Kelly.  As discussed above, the jury could have reasonably inferred that the Fellowship was a religion to Heinz, and that Heinz

knew the Fellowship was a religious organization.  Since Heinz knew the Fellowship was a religion, and he discriminated against Noyes because of her lack of religious beliefs, Kelly is liable for that discrimination.

Kelly also argues "Noyes' failure to prove Kelly knew the Fellowship was a religion prohibits (or at a minimum renders suspect) the jury's award of punitive damages." (Mot. at 4:25-5:1 (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536-37 (1999)).)  Kelly cites language from Kolstad holding that "intentional discrimination does not give rise to punitive damages liability under [the perceived risk] standard" where "the employer discriminates with the distinct belief that its discrimination is lawful," for instance when "[t]he underlying theory of discrimination [is] novel . . . ." Kolstad, 527 U.S. at 536-37.  However, Kelly did not preserve this defense for trial and the record does not support its argument.  See Passantino, 212 F.3d at 516 (good faith effort to comply with Title VII an affirmative defense); see also infra section II C (holding sufficient evidence supports a finding that Darrah Bixler and Nina Ramsey knew the Fellowship was a religion).

C. Evidence That Heinz Intentionally Discriminated Against Noyes

Kelly argues the record contains insufficient evidence for a reasonable jury to conclude that "Kelly's reason for selecting another employee (Joep Jilesen) was pretext, and that the real reason for the decision was her religion (or lack thereof)." (Mot. at 5:6-28 (citing evidence that Heinz first offered the position to Donna Walker, a non-Fellowship member; that Maya Bonhoff, also a non-Fellowship member, recommended Jilesen for the position; and other evidence).)  Noyes

1  counters "Defendant's evidence was contradicted."  (Opp'n at 5:23

2  (emphasis omitted).)

3          There was sufficient evidence to support a finding that

4  Heinz did not select Noyes for the position because she was not a

5  member of the Fellowship.  For example, the jury could have inferred

6  from an anonymous letter sent to Kelly in 1999 that Heinz treated

7  Fellowship members favorably.  In addition, Noyes was not a member of

8  the Fellowship and others testified she was qualified for the

9  position.  Moreover, Maya Bonhoff testified that the reason she

10  recommended Jilesen for the position was that she thought Noyes was

11  "off the table" and not being considered based on what Heinz had told

12  her.

13  II.  New Trial

14          A. Exclusion of Department of Fair Employment and Housing Letters

15          Kelly also argues exclusion of the California Department of

16  Fair Employment and Housing ("DFEH") "determination letters" in which

17  Noyes was informed that DFEH could not find sufficient evidence to

18  prove discrimination occurred was error.  (Mot at 7:4-5.)  One letter

19  was dated July 29, 2002, and responded to an administrative complaint

20  by Noyes regarding the April 2001 position.  (Decl. of E. Joseph

21  Connaughton in Supp. of Kelly's Mot. in Limine ("Connaughton in Limine

22  Decl."), Ex. 4, July 29, 2002 Letter from DFEH to Noyes.)  On August

23  13, 2002, another DFEH letter notified Noyes that it was closing her

24  file "based on insufficient evidence to show a violation of the Fair

25  Employment and Housing Act."  (Connaughton in Limine Decl., Ex. 6, Aug

26  13, 2002 Letter from DFEH to Noyes.)  Kelly's motion *in limine* to

27  include all evidence of these letters was denied and Noyes's motion *in*

28  *limine* to exclude the July 29, 2002 letter was granted.  (Order

1  Addressing *in Limine* Motions ¶¶ 6-7, Mar. 11, 2008; <u>see also</u> Trial

2  Tr., 206:1-207:4, Mar. 27, 2008 (reaffirming exclusion).)

3          Kelly argues a new trial should be granted because the

4  exclusion of this "relevant and highly probative evidence from the

5  [DFEH's] detailed, year-long investigation of Ms. Noyes'

6  administrative complaint both confused the jury and constrained

7  Kelly's defense, specifically regarding Ms. Noyes' claim for punitive

8  damages." (Mot. at 6:24-28.) Kelly argues "the DFEH evidence was

9  especially necessary to explain to the jury why Kelly took the

10  actions, and non-actions, that it did" and that "[t]he jury's only

11  question [during deliberation] was whether the DFEH had reached a

12  determination." (Mot. at 8:13-14, 9:17-18 (emphasis omitted).)

13          Noyes counters the determination letters were properly

14  excluded after "balancing [their] probative value against negative

15  effects that [their] admission would cause." (Opp'n at 6:22-23.)

16  Noyes further argues

17          the jury was informed by stipulation that
           Plaintiff had filed a charge with the DFEH in
18          August 2001 and that the investigation was carried
           out until August 2002. Defendant was thus able to
19          argue to the jury if it chose to do so that in
           deference to the DFEH's investigation, starting in
20          September, 2001, high-ranking personnel at
           Defendant's corporate headquarters had reason to
21          suspend their own investigation . . . .
                           * * *
22          Nevertheless, the major thrust of Plaintiff's
           evidence and arguments regarding punitive damages
23          involved the authorization and/or ratification by
           corporate . . . managing agents of discriminatory
24          practices in Nevada City <u>before</u> the promotion at
           issue and the authorization and/or ratification of
25          that promotion by corporate . . . managing agents
           several months <u>before</u> Defendant learned of the
26          DFEH filing.

27  (Opp'n at 8:11-18 (citing Trial Tr., 104:20-105:4, 11:28-12:6 (Court's

28  Address to Jury).)

> [A]n agency's determination that insufficient facts exist to continue an investigation is not *per se* admissible in the same manner as an agency's determination of probable cause. . . . There is a much greater risk of unfair prejudice involved in introducing a final agency ruling as opposed to a probable cause determination, because a jury might find it difficult to evaluate independently evidence of discrimination after being informed of the investigating agency's final results.

Beachy v. Boise Cascade Corp., 191 F.3d 1010, 1015 (9th Cir. 1999) (citing Gilchrist v. Jim Slemons Imps., Inc., 803 F.2d 1488, 1500 (9th Cir. 1986)).  Accordingly, under Federal Rule of Evidence 403, the DFEH letters' prejudicial effect must be weighed against their probative value.

Kelly argues that the probative value of the letters is high because it explains why Kelly did little in response to Noyes's complaints about being passed over for the 2001 position.  However, since evidence of the dates of the DFEH investigation were presented to the jury, the record allowed Kelly to argue that the DFEH investigation was the reason for any inaction.  In addition, the probative value of the letters was substantially outweighed by the risk of unfair prejudice to Noyes that evidence of a final agency decision would pose and the mini-trial that would result on what evidence was and was not considered when the DFEH made its determination.  Accordingly, exclusion of the DFEH determination letters was not error.

B.  Motivating Factor Jury Instruction

Kelly argues "the Court should have instructed the jury that the liability standard was whether or not Ms. Noyes' religion (or lack thereof) was a 'determining factor' (or the 'sole reason') for the

employment decision at issue in this lawsuit."[2]   (Mot. at 12:8-10.)
Kelly's proposed "determining factor" jury instruction was rejected
(Kelly's Proposed Jury Instruction No. 6., Dkt. No. 147) and the jury
was instructed that for Noyes to prevail on her Title VII claim she
must show that religion was a "motivating reason in the Defendant's
decision not to promote Plaintiff."   (Jury Instructions Given, Dkt.
No. 187, Instruction No. 14.)   Kelly argues it was error to give the
motivating factor instruction because "Noyes' lawsuit . . . was not a
mixed motive case [since] Ms. Noyes repeatedly and singularly alleged
and argued that her religious beliefs (or lack thereof) were the only
reason she did not receive the position of Software Development
Manager in April 2001."   (Mot. at 10:21-25 (citing Compl. ¶¶ 32, 46;
Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 15:6-9) (emphasis
omitted).)   Kelly further argues "during trial Ms. Noyes never claimed
Kelly had a legal motivation to deny her the position she desired."
(Id. at 11:23-24 (emphasis omitted).)   Noyes rejoins that the
motivating factor instruction was correct because "based on all of the
evidence presented . . . , the jury could have found that
'discrimination [was] one of two or more reasons for the challenged
decision, at least one of which may [have been] legitimate . . . [.]'"
(Opp'n at 13:12-17 (quoting Costa v. Desert Palace Inc., 299 F.3d 838,
856 (9th Cir. 2002)).)

        "'[S]ingle-motive' and 'mixed-motive' cases [are not]
fundamentally different categories of cases.  Both require the

---

        [2]   Kelly does not argue that a "same decision" defense
instruction (which it was entitled after a determination that a mixed
motive instruction was appropriate) should have been given.   Kelly
declined that instruction at trial.  (See Trial Tr., 181:4-183:3, Mar.
27, 2008 (discussion of the Court and counsel).)

employee to prove discrimination; they simply reflect the type of evidence offered." Costa, 299 F.3d at 857.  Accordingly, contrary to Kelly's arguments, "a case need not be characterized or labeled at the outset.  Rather, the shape will often emerge after discovery *or even at trial*.  Similarly, the complaint itself need not contain more than the allegation that the adverse employment action was taken because of a protected characteristic." Id. at 856 n.7 (emphasis added).

> Once at the trial stage, the plaintiff is required to put forward evidence of discrimination "because of" a protected characteristic.  After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly.
>
> * * *
>
> [I]n cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was "a motivating factor" in the challenged action.

Id. at 856-57 (footnote omitted).

Here, Kelly presented evidence that Noyes's people skills were inferior to Jilesen's and the jury could reasonably have found that this was one of the reasons she did not receive the position. (See Trial Tr., 97:9-13, Mar. 27, 2008 (testimony of William Heinz).) In addition, at the conclusion of the presentation of evidence, the Court determined that the evidence supported a mixed motive instruction.  (See Trial Tr., 99:12-100:4, Apr. 3, 2008.) Accordingly, giving the instruction was not error.

C.  Evidence of Action By a Kelly Officer, Director, or Managing Agent

Kelly argues that "[a] new trial regarding the punitive damages verdict is called for because Ms. Noyes presented no evidence

from which the jury could have found that [Heinz] was an officer, director, or managing agent of Kelly . . . ." (Mot. at 13:20-23, 14:6-9.)  Noyes argues she

> is basing (and has always based) her claim on the authorization and/or ratification of Mr. Heinz's discriminatory personnel decisions by numerous other corporate officers, directors and/or managing agents back at corporate headquarters in Michigan.  These witnesses include . . . Darrah Bixler, Nina Ramsey, Tarek Brantley, Theresa Dolbert, and Dana Warren . . . .

(Opp'n at 19:26-20:4 (emphasis omitted) (citing evidence of Kelly corporate having prior knowledge of Heinz's favoritism of Fellowship members, and of Noyes's complaints to Bixler and Ramsey regarding the promotion).)

Kelly rejoins Noyes failed to show that any of these Kelly employees were directors or managing agents.  (Reply at 11:19-28.) Kelly further argues that Noyes failed to show that any of these employees knew of Heinz's conduct and its outrageous character, which is required for ratification.  (Id. at 11:22-28 (citing Cruz v. HomeBase, 83 Cal. App. 4th 160, 163 (2000).)[3]

> [W]hen a motion for a new trial is based on insufficiency of the evidence, "a stringent standard applies . . . [and] a motion for a new trial may be granted on this ground only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result."

Leavey v. UNUM/Provident Corp., 2006 WL 1515999, at *9 (D. Ariz. May 26, 2006) (quoting Johnson v. Paradise Valley Unified Sch. Dist., 251

---

[3]   On June 17, 2008, NOyes filed Post-Hearing References to Trial Transcripts.  On June 19, 2008, Kelly objected to submission of these references after the hearing.  Since the Court was aware of the relevant sections of the trial transcripts before Noyes's June 17, 2008 filing, this dispute need not be decided.

F.3d 1222, 1229 (9th Cir. 2001)).  "While the Court may weigh the evidence and assess the credibility of witnesses [under the Rule 59 standard], it may not grant a new trial 'merely because it might have come to a different result from that reached by the jury.'"  Id. (quoting Roy v. Volkswagen of Am. Inc., 896 F.2d 1174, 1176 (9th Cir. 1990)).

Under California Civil Code section 3294, an employer will be liable for punitive damages based on the acts of an employee if, by clear and convincing evidence, the employer

> had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

Cal. Civ. Code § 3294(b).

"'Managing agents' are employees who 'exercise[] substantial discretionary authority over decisions that ultimately determine corporate policy." Cruz v. HomeBase, 83 Cal. App. 4th 160, 167 (2000) (citing White v. Ultramor, Inc., 21 Cal. 4th 563, 573 (1999)) (emphasis omitted).  The trial testimony of Nina Ramsey ("Ramsey") constitutes substantial evidence that she exercised substantial discretionary authority over Kelly personnel decisions that ultimately determined corporate policy.[4]  Ramsey testified she is "the Senior

_____

[4] Darrah Bixler may also have exercised sufficient discretionary authority to be a managing agent herself. See Cruz, 83 Cal. App. 4th at 168 (noting in White, 21 Cal. 4th at 569, the court found "a regional director of eight stores, had sufficient authority over corporate policy to be a 'managing agent' [since t]here was a strong inference that a
(continued...)

Vice President of Human Resources for Kelly Services [and has] responsibility for the human resource function in [Kelly, including] the employee relations practices around the world." (Trial Tr., 4:24-5:6, Apr. 3, 2008 (testimony of Nina Ramsey).)

Kelly argues "Ms. Ramsey simply could not have know of, or ratified Mr. Heinz' decision to promote Mr. Jilesen, rather than Ms. Noyes, in *April 2001*" because "she first learned of Ms. Noyes' alleged discriminatory treatment in *July 2001* when she received an e-mail from Ms. Noyes." (Reply at 12:15-23.) However, Ramsey need not have ratified Heinz's decision to promote Jilesen before, or at the moment that decision was made since "'ratification' is the '[c]onfirmation and acceptance of a previous act.'" Cruz, 83 Cal. App. 4th at 168 (quoting Black's Law Dict. (7th ed. 1999) at 1268).

> For purposes of determining an employer's liability for punitive damages, ratification generally occurs where . . . the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties. The issue commonly arises where the employer or its managing agent is charged with failing to intercede in a known pattern of workplace abuse,

---

[4](...continued)
manger with these powers had authority to set corporate policies," and therefore, holding "a supervisor subordinate to the store manager in a single outlet of a multi-store chain" was not a managing agent). Darrah Bixler testified that in spring of 2001 she was a human resources manager responsible for human resources at Nevada City, and she was also responsible for human resources at Kelly's IT division, corporate sales and marking, and all the corporate groups that were located in Kelly's corporate headquarters, which was a total of roughly 500 employees. (Trial Tr., 32:5-19, 53:23-24, Apr. 3, 2008 (testimony of Darrah Bixler).) She was responsible for how the hiring processes enacted as a result of the 1999 investigation were implemented. (Id. at 68:13-20.) She was also responsible for setting policies and approving salaries and raises. (Id. at 84:23- 85:10.) However, because there is evidence that Ramsey knew and approved of Bixler's actions regarding Heinz, this issue is not reached.

1              or failing to investigate or discipline the errant
employee once such misconduct became known.

2              Corporate ratification in the punitive damages
context requires actual knowledge of the conduct

3              and its outrageous nature.

4  Coll. Hosp. v. Super. Ct., 8 Cal. 4th 704, 726 (1994) (citations

5  omitted).

6       Sufficient evidence exists from which the jury could have

7  found that Ramsey knew Heinz was discriminating against non-fellowship

8  members because of religion, and approved or ratified this conduct;

9  and the jury's verdict is not against the great weight of the

10  evidence.  Ramsey testified that she learned of the anonymous letter

11  in 1999, was part of the team hearing results of the subsequent

12  investigation, and that eventually it became her responsibility to

13  ensure that higher-level management decisions were not made by Heinz

14  but by Kelly's corporate offices.  (Trial Tr., 6:7-9, 9:1-3, 17:8-24,

15  Apr. 3, 2008.)  Ramsey also testified that in 2001, she learned of

16  Noyes's complaints that Heinz was giving good jobs to members of the

17  Fellowship and that Noyes asked her to give Noyes the disputed

18  position and to fire Heinz.  (Id. at 10:8-18, 11:11-13, 24:1-10.)

19       In 2001, Ramsey oversaw Darrah Bixler ("Bixler"), who was

20  the human resource manager responsible for Nevada City and reported to

21  Ramsey.  (Id. at 10:15-18.)  Ramsey testified that she instructed

22  Bixler to follow up on Noyes's complaint and to keep her informed of

23  the results of the investigation.  (Id. at 24:18-25.)  Accordingly,

24  the jury could have reasonably concluded that what Bixler learned and

25  concluded during her investigations was communicated to Ramsey.

26       In 2001, Bixler was a human resource manager and the lead

27  human resources person for the Nevada City office with the authority

28  to process and approve personnel decisions made by Heinz.  (Trial Tr.,

53:23-55:6, Apr. 3, 2008 (testimony of Darrah Bixler).)  Bixler
testified that in May of 2001, Noyes told her about the promotion of
Jilesen, that she immediately told Ramsey about it, and that she and
Ramsey began investigating the Fellowship.  (Id. at 35:11-36:10.)
There was substantial evidence from which the jury could have drawn
the reasonable inference that, despite her testimony to the contrary,
Bixler had discovered that the Fellowship was a religion and that
Heinz was discriminating in favor of Fellowship members.  Bixler
testified that she investigated the 2001 promotion and tried to learn
what the Fellowship was because she had heard that Heinz put
Fellowship members into management positions.  (Id. at 63:7-21, 74:12-
21.)  Bixler testified that Steve Wehrmann ("Wehrmann") told her in
his exit interview that he was upset with Heinz and his preference of
Fellowship members, using the hiring of Andrew Vernon as an example.
(Id. at 70:13-18, 60:9-61:5.)  Wehrmann testified that he told Bixler
that he left Kelly because of issues with the Fellowship and hiring
practices and preferences shown to Fellowship member Mario Fantoni.
(Trial Tr., 41:12-17, Mar. 27, 2008 (testimony of Steve Wehrmann).)
Bixler also testified that Maya Bohnhoff told her that Heinz had
pressured her to hire Fellowship member Andrew Vernon.  (Trial Tr.,
57:20-58:5, Apr. 3, 2008 (testimony of Darrah Bixler).)  Bixler
testified that she looked up the Fellowship of Friends on the website
RickRoss.com, which she characterized as a "cult watchdog website."
(Id. at 74:22-11.)  Evidence was presented that at that time Rick
Ross's website contained substantial information regarding the
Fellowship of Friends, characterizing it as a religious cult.  (Trial
Tr., 46:12-48:5, 29:10-14, Mar. 25, 2008 (testimony of Rick Ross).)
Bixler also testified that she knew of the 1999 anonymous letter,

which had characterized the Fellowship as a religion, and that she knew Fellowship members were required to tithe part of their income. (Trial Tr., 57:1-3, 58:18-21, Apr. 3, 2008 (testimony of Darrah Bixler).)

There was also evidence that cast doubt on the veracity of Bixler's testimony and suggests that she was motivated to protect Heinz and his employment decisions at the expense of Noyes's rights. Bixler testified that another member of the Nevada City management team, Victoria Smart, was a Fellowship member and warned her that any decision to restrict hiring of Fellowship members would be religious discrimination and that Bixler was worried about that. (Id. at 64:1-3.)  In May of 2001, Smart sent Bixler an email in which she wrote: "We cannot refuse to consider or hire qualified Fellowship members because that is prima facie religious discrimination and that has occurred here." (Id. at 90:7-22.)  This email suggests that Bixler knew the Fellowship was a religious organization because one of its members, Smart, was referring to discrimination against Fellowship members as religious discrimination.

Bixler also testified that at some point she concluded Heinz had not discriminated against Noyes, but could not tell when that conclusion was made and admitted that she never communicated that conclusion to Noyes. (Trial Tr., 64:8-66:22, Apr. 3, 2008 (testimony of Darrah Bixler).)  The jury could have concluded that if Bixler truly believed no discrimination had occurred, she would have communicated that conclusion to Noyes. (See Trial Tr., 145:6-24, Mar. 25, 2008 (testimony of Lynn Noyes, discussing that Bixler had not been responsive to her complaint and she felt Kelly had decided to do nothing).)

Further, an inference could be drawn from the record that Bixler was attempting to silence Noyes's complaints. See Weeks v. Baker & McKenzie, 63 Cal. App. 4th 1128, 1159 (1998) (finding "evidence that persons who complained [about employee's sexual harassment] actions were transferred or were themselves terminated as employees" supported a finding that employer did not "take [the] misconduct seriously" and consciously disregarded the rights of others). Noyes testified that Bixler threatened her that she could be sued for slander if she did not stop alleging that Heinz had promoted Jilesen because of his religion (id. at 144:6-7, 146:10-11) and in an email from Bixler to Noyes, Bixler wrote "your alleged comments regarding Joep [Jilesen] and/or William [Heinz] appear to be based on your speculation about previous events in which you were not directly involved. I wanted to let you know that comments of this nature were highly speculative and could potentially amount to defamation." (Trial Tr., 82:10-22, Apr. 3, 2008 (testimony of Darrah Bixler).)

Finally, the jury could have reasonably inferred that Bixler and Ramsey's failure to intercede or discipline Heinz as a result of his 2001 promotion decision meant they intended to approve of and ratify this decision. Bixler testified that she had responsibility for and approved the 2001 personnel decisions made by Heinz. (Id. at 54:5-20.) Ramsey testified that Bixler was responsible for human resources at Nevada City and that Bixler reported to her. (Id. at 10:8-18.) Noyes testified that four months after the promotion she called Ramsey and told her that Bixler's inaction after her investigation suggested "Kelly had decided to do nothing." (Trial Tr., 145:6-24, Mar. 25, 2008 (testimony of Lynn Noyes).)

The jury could reasonably infer from the above evidence that

Bixler and Ramsey knew of Heinz's decision to promote Jilesen over
Noyes, knew that Heinz's decision was based on religion—and thus
constituted outrageous and discriminatory action—and approved of this
action by failing to intervene.  On the other hand, Bixler and Ramsey
testified that they did not think the Fellowship was a religion or
that Heinz discriminated on the basis of religion.  However, in
weighing the evidence, the jury's verdict is not against the great
weight of the evidence.[5]

III.  Unconstitutionally Excessive Punitive Damages

        Kelly argues the punitive damages verdict is
unconstitutionally excessive because Kelly did not act reprehensibly
and a 40 to 1 ratio of punitive to economic damages is "plainly
unconstitutional."  (Mot. at 16:8, 17:22-18:2.)  Noyes counters that
the "punitive damage award of $5.9 million is 9.1 times the [total]
compensatory award, or a 9.1 to 1 ratio" and that Kelly's conduct
"clearly supports a verdict finding of 'reprehensibility.'"  (Opp'n at
21:21-23, 22:25-26.)

        "The Due Process Clause of the Fourteenth Amendment
prohibits the imposition of grossly excessive or arbitrary punishments
on a tortfeasor."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538
U.S. 408, 416 (2003) (citing Cooper Indus., Inc. v. Leatherman Tool
Group, Inc., 532 U.S. 424, 433 (2001)).  The Supreme Court has
established "three guideposts" for assessing whether a punitive
damages award is unconstitutionally excessive: (1) "the degree of

---

        [5]    Kelly also argues in its Reply that because of this issue "the
punitive damages award is defective as a matter of law."  (Reply at
11:17-18.)    However, Kelly's arguments also fail under Rule 50's
judgment as a matter of law standard; drawing all reasonable inferences
in favor of Noyes, sufficient evidence exists for a reasonable jury to
find Kelly knew and approved of Heinz's actions.

reprehensibility" of the defendant's conduct; (2) "the disparity

between the harm or potential harm suffered by [the plaintiff] and

[her] punitive damages award; and" (3) "the difference between this

remedy and the civil penalties authorized or imposed in comparable

cases." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996).

A.   Degree of Reprehensibility

The degree of reprehensibility is determined by considering

whether

> the harm caused was physical as opposed to
> economic; the tortious conduct evinced an
> indifference to or a reckless disregard of the
> health or safety of others; the target of the
> conduct had financial vulnerability; the conduct
> involved repeated actions or was an isolated
> incident; and the harm was the result of
> intentional malice, trickery, or deceit, or mere
> accident.

State Farm, 538 U.S. at 419.  Kelly argues Noyes presented no evidence

on any of these factors.[6]  (Mot. at 16:19-25.)

I.   Physical Versus Economic Harm

Noyes argues "the intentional discrimination [she]

experienced . . . represents more than pure monetary harm, especially

_____

[6]   Kelly also argues in its Reply that the Court "apparently determined that there were, in fact, legitimate reasons for not promoting Ms. Noyes – otherwise the Court could not have given a mixed motive instruction. Where — as here — legitimate factors were at play, reprehensibility is — at best — negligible or mitigated as a matter of law." (Reply at 15:6-12 (citation omitted).)  A mixed motive instruction, however, only required a finding that the evidence *could reasonably support* the conclusion that there was a legitimate reason for the action. Costa, 299 F.3d at 857-59.  In addition, the cases on which Kelly relies do not support its argument since their holdings relied on the finding that no evidence of malice was presented. See, e.g. Deneed v. Nw. Airlines, Inc., 132 F.3d 431, 439 (8th Cir. 1998) ("[T]here is no evidence of malice or reckless indifference. Accordingly, the district court did not err by striking the jury award of punitive damages.") Here, there was substantial evidence to support a finding that Heinz acted with malice and his actions were approved by Ramsey.

since the jury awarded [her] $500,000 for non-economic damages for her emotional distress." (Opp'n at 23:8-12.) Kelly rejoins "the jury awarded Ms. Noyes $500,000 for emotional distress, despite the fact that Ms. Noyes presented no evidence of emotional distress other than her testimony that 'she got a prescription for Xanax a few times' and felt depressed and anxious." (Reply at 17:16-20 (citing Opp'n at 23:13-20).)

Here, "[t]he harm arose from a transaction in the economic realm, . . . there were no physical injuries . . . ." State Farm, 538 U.S. at 426. However, "intentional discrimination [is] 'more reprehensible than would appear in a case involving economic harms only[.]'" Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1043 (9th Cir. 2003). Accordingly, this factor weights somewhat in Noyes's favor.

ii. Reckless Disregard of the Health or Safety of Others

Noyes concedes "'[h]ealth and safety' is not strongly implicated here other than Kelly's causing Ms. Noyes significant emotional distress . . . ." (Opp'n at 23:25-27.) Noyes has not shown that a risk of emotional distress shows a reckless disregard of the health or safety of others. Accordingly, this factor weighs against finding Kelly's conduct reprehensible.

iii. Financially Vulnerable Target

Noyes contends this factor weighs in favor of the reprehensibility finding, relying on Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 422 F.3d 949, 958 (9th Cir. 2005), and arguing she "is an employee, who, during her employment, depended on Kelly for her income. While she was not particularly 'vulnerable' . . . the financial disparity between the

1  two parties could hardly have been greater."  (Opp'n at 24:11-13.)

2  However, while the jury could have reasonably found that

3  Noyes was passed over for a promotion because she was not a member of

4  the Fellowship, Noyes still had a secure position at Kelly that

5  supported her livelihood, and thus she was not a particularly

6  financially vulnerable target.  See Planned Parenthood, 422 F.3d at

7  958 (holding physicians were financially vulnerable "because their

8  livelihoods depended upon their [medical] practices," which were

9  threatened by defendants).  Nonetheless, "this subfactor militates in

10  favor of [finding] a modest degree of reprehensibility" since Noyes

11  relied on her job with Kelly for her livelihood and was found to have

12  been prevented from receiving a promotion because of Kelly's conduct

13  involved with the discriminatory promotion of a Fellowship member.

14  Gober v. Ralphs Grocery Co., 137 Cal. App. 4th 204, 220 (2006)

15  (finding modest reprehensibility "where the victims [of sexual

16  harassment] were a group of grocery store employees that relied on

17  their jobs with [defendant] for their livelihoods").  In this sense,

18  Kelly allowed its wealth to be wielded in a manner bearing some

19  relation to the harm Noyes sustained.  See State Farm, 538 U.S. at 427.

20  iv. Repeated Actions or Isolated Incident

21  Noyes argues the evidence established

22  a pattern and practice of discriminatory conduct
   in favor of Fellowship members.  Stand-outs who
23  benefitted from such discriminatory treatment in
   terms of hiring, promotions and salaries included
24  Fellowship members Mario Fantoni, Gilbert Moore
   and Andrew Vernon.  All of the discriminatory
25  conduct was similar, all of it took place in
   Nevada City, all of it was orchestrated by . . .
26  Heinz, and all of it was authorized or ratified by
   Kelly Corporate representatives.

27

28  (Opp'n at 25:2-13 (citing Trial Tr., 121:17-25, 122:1-25, 123:9-11,

Mar. 26, 2008 (testimony of Maya Bohnhoff); Trial Tr., 41:16, Mar. 27, 2008 (testimony of Steve Wehrmann)).)

Noyes presented substantial evidence that Kelly had been aware of, and investigated, complaints of Heinz's favoritism towards Fellowship members before April 2001, which led to, at least officially, Kelly's limitation on Heinz's ability to hire high-level management positions. (See, e.g., Trial Tr., Apr. 3, 2008 (testimony of Nina Ramsey); Trial Tr., 41:5-17, Mar. 27, 2008 (testimony of Steve Wehrmann).) Evidence was also presented that Heinz's favoritism likely harmed Noyes on two occasions before 2001 when management positions were given to other Fellowship members instead of Noyes. (Trial Tr. 104:9-113:22, 119:21-24, Mar. 25, 2008 (Noyes Testimony).) Thus, Kelly's conduct harming Noyes was not an isolated incident, and this factor weighs in favor of finding Kelly's conduct reprehensible.

v. Intentional Malice or Mere Accident.

Kelly argues "there was, in fact, no trickery or deceit, and Kelly acted in good faith" given the DFEH determination that there was insufficient evidence to establish that any discrimination occurred and Darrah Bixler's decision to investigate "whether there had been discrimination in the Nevada City office." (Mot. at 17:1-10.) Noyes argues "[a]s stated in the Special Verdict, the jury found that Kelly engaged in prohibited conduct with 'oppression, malice, or fraud.'" (Opp'n at 25:27-26:2.)

Substantial evidence supports the jury's finding that Heinz acted with oppression, malice or fraud and that a managing agent of Kelly, Ramsey, knew of and ratified that conduct. While the record does not shown that Ramsey herself discriminated against Noyes or directed Heinz to do so, evidence exists that she knew Heinz was

discriminating against Noyes based on religion and she turned a blind

eye.  Kelly's closing arguments and trial testimony indicate that

deceitfulness was afoot.  During closing argument, Kelly's counsel

argued about the position to which Noyes failed to get promoted:

> You could determine that there really wasn't even
> a promotion to begin with.  Remember what Joep
> Jilesen said?  He didn't think he was promoted.
> He did the same thing that he was doing, he didn't
> get a new title, he continued to do the exact same
> stuff that he was doing before.  Remember what Mr.
> Heinz said?  He didn't think there was a promotion
> either.  Joep didn't come to the managers
> meetings, he wasn't doing performance reviews, he
> wasn't setting people's compensation with HR,
> anything like that.

(Trial Tr., 139:7-16, Apr. 3, 2008 (closing argument by Mr.

Connaughton).)  Noyes's counsel countered:

> the idea that this was not a management job has to
> be considered with Darrah Bixler's testimony, and
> others who have said, yes, it was a manager job,
> someone had to manage the author/developers.  That
> ended up something that Joep did, and he ended up
> getting a raise for that job. . . . [T]he job
> didn't evaporate, there still needed to be a
> manager, and it should have been Ms. Noyes.

(Trial Tr. 154:19-155:3, Apr. 3, 2008 (Rebuttal Argument by Ms.

Jones).)  In other words, Kelly's counsel argued that Joep Jilesen was

not promoted when there was sufficient evidence for the jury to find

that indeed he was promoted.  This argument, and the evidence relied

on for support thereof, indicates Kelly was being deceitful by trying

to hide the promotion.  Accordingly, this factor weighs in favor of

finding Kelly's conduct reprehensible.

In sum, viewing the factors as a whole indicates that

Kelly's conduct displayed a modest degree of reprehensibility.

B. Ratio of Punitive to Compensatory Damages

Kelly argues "[b]ecause the jury awarded Ms. Noyes such a

substantial sum [in compensatory damages], the $5.9 million dollar punitive damages award violates the Due Process Clause of the Fourteenth Amendment as it reflects a multiplier of approximately 40. Such a ratio . . . is plainly unconstitutional." (Mot. at 17:22-18:2 (emphasis omitted).) Noyes counters that in cases of racial discrimination the Ninth Circuit has held that a 9 to 1 ratio is constitutional. (Opp'n at 29:2-22, 31:12-17 (citing Bains LLC v. Arco Prods. Co., 405 F.3d 764, 776-77 (9th Cir. 2005); Swinton v. Potomac Corp., 270 F.3d 794, 819 (9th Cir. 2001); Zhang, 339 F.3d at 1044.)

Kelly's asserted 40 to 1 ratio was computed by excluding the emotional distress damages component of Noyes's award. Kelly cites no authority supporting this exclusion. Contrary to Kelly's position, emotional distress damages are included in calculating the ratio of punitive to compensatory damages. See, e.g., State Farm, 538 U.S. at 426; Pavon v. Swift Transp. Co. Inc., 192 F.3d 902, 909-10 (9th Cir. 1999). Accordingly, the appropriate ratio to examine is a ratio of 9.1 to 1.

The Supreme Court held in State Farm "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . When compensatory damages are substantial, . . . a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 U.S. at 425. In Planned Parenthood, the Ninth Circuit held

> [i]n cases where there are significant economic damages and punitive damages are warranted but behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of constitutionality. In cases with significant economic damages and more egregious behavior, a single-digit ratio greater than 4 to 1 might be constitutional.

1  <u>Planned Parenthood</u>, 422 F.3d at 962 (citing first <u>State Farm</u>, 538 U.S.

2  at 425, citing second, <u>Zhang</u>, 339 F.3d at 1043-44 & <u>Bains</u>, 405 F.3d at

3  776-77.)

4          Here, Noyes was awarded significant compensatory damages in

5  the amount of $647,174.  In addition, while Kelly's behavior was

6  sufficiently reprehensible to warrant punitive damages, it was not

7  highly egregious.  Finally, $500,000 of Noyes's compensatory damages

8  award is in emotional distress damages.  The Supreme Court stated in

9  <u>State Farm</u> that emotional distress compensatory damages

10              likely [are] based on a component which [is]
               duplicated in the punitive award.  Much of the
11             distress was caused by the outrage and humiliation
               the [plaintiffs] suffered at the actions of [the
12             defendant]; and it is a major role of punitive
               damages to condemn such conduct.  Compensatory
13             damages, however, already contain this punitive
               element.

14

15 <u>State Farm</u>, 538 U.S. at 426.  Accordingly, a ratio of 1 to 1 is the

16 constitutional limit in this case.  <u>See</u> <u>id.</u> at 429 ("An application of

17 the . . . guideposts to the facts of this case, especially in light of

18 the substantial compensatory damages awarded (a portion of which

19 contained a punitive element), likely would justify a punitive damages

20 award at or near the amount of compensatory damages.").

21          C. Civil Penalties Authorized in Comparable Cases

22          Limiting the ratio of punitive to compensatory damages to 1

23 to 1 is further supported by the penalties authorized in Noyes's Title

24 VII claim.[7]  <u>See</u> <u>Astor v. Rent-A-Center, Inc.</u>, 2007 WL 184741, at *18-

25 19 (Cal. App., 2007) (considering Title VII punitive damages cap when

26 _____

27      [7]  In its Motion, Kelly concluded the third guidepost is
    inapplicable. (Mot. at 16 n.7.)  However, at oral argument Kelly argued
28  that the Title VII punitive damage limit suggested damages awarded are
    unconstitutionally excessive.

1   analyzing third guidepost in FEHA case). "Congress . . . imposed a

2   $300,000 punitive damage cap for violations of Title VII . . . ."

3   Zhang, 339 F.3d at 1045; 42 U.S.C. § 1981a(b)(3)(D). Here, the $5.9

4   million punitive damages award dwarfs the Title VII cap and the 1 to 1

5   ratio is more than double it.

6                       CONCLUSION

7        For the reasons stated, the punitive damage award is reduced

8   to an amount equal to the compensatory damages: $647,174. See

9   Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir.

10   1999) ("[U]pon determination of the constitutional limit on a

11   particular award, the district court may enter a judgment for that

12   amount as a matter of law."); Leatherman Tool Group, Inc. v. Cooper

13   Indus., Inc., 285 F.3d 1146, 1151 (9th Cir. 2002) ("[W]e see no reason

14   to disagree with the Eleventh Circuit's opinion in Johansen, that an

15   appellate court need not remand for a new trial in every case in which

16   it finds that a punitive damages award exceeds the constitutional

17   maximum." (citation omitted)). Accordingly, the Clerk of the Court

18   shall enter judgment in favor of Plaintiff for a total of $1,294,348.

19   The remainder of Defendant's motion for judgment as a matter of law

20   and new trial is denied.

21        IT IS SO ORDERED.

22   Dated: July 25, 2008

23

24                         GARLAND E. BURRELL, JR.

25                         United States District Judge

26

27

28