IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE GARLAND E. BURRELL, JR., CHIEF JUDGE

---oOo---

LYNN NOYES,

      Plaintiff.

vs.                            No. Civ.  S-02-2685

KELLY SERVICES, INC.,

      Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

HEARING

MONDAY, JUNE 16, 2008

---oOo---

Reported by:     KIMBERLY M. BENNETT, CSR #8953

                  RPR, CRR, RMR

APPEARANCES

For the Plaintiff:

      LAW OFFICES OF M. CATHERINE JONES
      308 Main Street, Suite 3
      Nevada City, California  95959
      BY:  M. CATHERINE JONES
          Attorney at Law

For the Defendant:

      PAUL PLEVIN SULLIVAN and CONNAUGHTON
      401 B Street, 10th Floor
      San Diego, California  92101
      BY:  E. JOSEPH CONNAUGHTON
          Attorney at Law

1                          SACRAMENTO, CALIFORNIA

2                          MONDAY, JUNE 16, 2008

3                              ---oOo---

4          THE CLERK:  Calling 02-2685; Noyes versus Kelly

5     Services.

6          MS. JONES:  Catherine Jones on behalf of the

7     plaintiff.  And I'm not sure if Robert Burch is on the line.

8     No?

9          THE COURT:  He's not on the line.  Something is wrong

10    with the telephone system.  My courtroom deputy has tried to

11    reach the person in IT who could perhaps remedy the problem,

12    but at this point it's not remedied.

13         MS. JONES:  Okay.  I think he would be more likely to

14    talk on the attorney's fees motion anyway.

15         THE COURT:  Okay.

16         MR. CONNAUGHTON:  Good morning, Your Honor.  Joe

17    Connaughton on behalf of defendant.

18         THE COURT:  This is on calendar for oral argument.

19    You can argue.

20         MR. CONNAUGHTON:  Thank you, Your Honor.  Would you

21    prefer that I use the podium or stay at the table?

22         THE COURT:  The podium, because you're not using the

23    microphone at the table and it's going to be very difficult.

24    You may have been using it, but you weren't using it

25    effectively.

1          MR. CONNAUGHTON:  Thanks, Your Honor.

2          Good morning.  I will first address the punitive

3     damages issue raised by Your Honor in Your Honor's order of

4     the other day regarding whether or not there was a managing

5     agent sufficient for punitive damages to exist.

6          The crux of this issue goes back to California Civil

7     Code Section 3294.  3294 says that there are two situations,

8     and two situations only, when punitive damages are

9     appropriate against a California employer.  Those are:

10          Number one, if an officer, director, or managing agent

11     acts with malice, oppression, or fraud.  That is not an issue

12     here.  Plaintiff has conceded she is not proceeding under

13     that theory.  So all we have left is the second prong of

14     3294.

15          The second prong of 3294 requires that an officer,

16     director, or managing agent ratify or approve the despicable

17     conduct, the malicious, oppressive, fraudulent conduct,

18     otherwise engaged in by some other employee.  That's what

19     this entire issue is about.

20          Two issues on that, Your Honor:

21          Number one, I think it would be appropriate for Your

22     Honor to make a ruling that, in fact, there was insufficient

23     despicable conduct by anybody.  And I'd ask that -- there is

24     a semi new issue that came up as I was reviewing plaintiff's

25     reply briefs that I wish to raise, and that is even the

1    United States Supreme Court has now recognized that there are

2    certain cases, even intentional discrimination cases, where

3    punitive damages are inappropriate.  And I would suggest that

4    this is exactly one of those cases.

5         The case is Kolstad versus American Dental

6    Association.  I think it's a 1999 Supreme Court case.  And if

7    Your Honor needs a cite, it's 527 US 526.

8         The issue there, what the Supreme Court says, is that

9    if the person making the decision doesn't realize that

10   they're breaking the law, there should be no punitive

11   damages, even if, in fact, they are.  And that's exactly what

12   we had here with Mr. Heinz, who testified, nope, he didn't

13   think this was a religion.  If anything what we have is

14   associational discrimination, but he didn't see it as a

15   religion.  The other people testified they didn't know it was

16   a religion.  So, perhaps this is exactly that narrow type of

17   case described in Kolstad.

18        In addition, the other interesting thing that Kolstad

19   says is that punitive damages may not be appropriate in a

20   case where there is a novel theory of law.  And I think we

21   can all argue whether or not this particular theory, this

22   reverse religious discrimination, is difficult or not, but

23   it's certainly novel.  The Ninth Circuit opinion was the

24   first case, at least that we saw, to actually authorize it

25   when it reversed the original summary judgment.

1          So it is not a stretch to not only either rely upon

2     the fact that perhaps this was associational discrimination;

3     the person making the decision didn't realize he knew what he

4     was doing was wrong.  Or, this is a new theory, and we're not

5     going to allow this massive, enormous punitive damages award

6     on this narrow, new, novel theory of law.  So that's number

7     one.  It would be easy to say there really was no despicable

8     conduct by anyone, but let's get to the more, I think, direct

9     issue.

10          For there to be ratification or authorization, it

11     requires evidence, clear and convincing evidence, that the

12     managing agent intended to adopt or approve whatever that

13     despicable conduct was; adopt or approve that malicious,

14     fraudulent conduct.  There are two key cases on that point.

15     One is College Hospital versus Superior Court, the other is

16     Cruz versus Home Base.  They're both cited in our briefs.

17          Here there is only one managing agent.  Just one.

18     That was Ms. Ramsey.  Everyone else who testified, or about

19     whom there was evidence, was a human resources generalist, or

20     someone upon whom there was absolutely no evidence that they

21     could have affected corporate policy.  So, starting with that

22     point, we've got this one person.

23          So the question is, is there clear and convincing

24     evidence that Ms. Ramsey took action to approve, ratify, the

25     one decision that was at issue here, this failure to promote.

1    And the evidence, Your Honor, showed she didn't even know

2    about it until after.  She didn't know the decision had been

3    made regarding Ms. Noyes until after it occurred.  So, she

4    certainly didn't have prior knowledge, as would otherwise be

5    required.  And then after she knew, what was the admissible

6    evidence about what Ms. Ramsey did, our only managing agent?

7    She required an investigation to be done.  She helped put in

8    place remedial measures.  And then they waited, once the DFEH

9    ruled, and they got that ruling that supported the actions

10   that they had taken.  That is it.  There is no action on her

11   part that showed she had any intent to approve, ratify,

12   authorize anything that Mr. Heinz had done.  And I would

13   suggest that, by itself, leaving aside the Kolstad issues,

14   leaving aside everything else, is enough to require the

15   punitive damages issue to be taken away.

16        In addition, Your Honor, this Court also concluded,

17   when it went through its mixed motive analysis, and I'll

18   leave that issue for some other time, that there must have

19   been sufficient evidence for there to have been a good motive

20   for Lynn Noyes not to have been selected, otherwise Your

21   Honor couldn't have given that mixed motive instruction.

22   There had to have been sufficient evidence to say, yes, they

23   could have done this for a fair reason.  That additionally

24   shows the lack of despicable conduct on behalf of anybody.

25        I will leave additional comments, if Your Honor wishes

1    them, for after Ms. Jones makes her comments.

2          But upon that one issue, on managing agent, I'd ask

3    Your Honor to re-review that Cruz case, and the College

4    Hospital case, and White versus Ultramar, because California

5    law is pretty specific.

6          Federal law is easy because we've got that 300,000

7    cap.  We're 20 times over that.  This jury went 20 times over

8    what the federal law would require.  And California law has

9    similarly protective measures, and they go at this managing

10   agent, officer, director issue.

11         Okay.  Let me hit the second issue, if only briefly,

12   on the constitutionality of the amount.

13         State Farm, and Gore, and the State Supreme Court case

14   Simon all stand for the same thing, more or less; that you

15   look at reprehensibility, look at these other factors, and

16   then at the end of the day, if the compensatory award is

17   already substantial, we have to be very careful with any

18   punitive award.  So, if the compensatory award looks like it

19   includes punitive amounts, anything more than one time the

20   amount would be getting past our due process limits.  If it

21   has -- and I think the word in State Farm is substantial,

22   they say anything more than one or two or four times would be

23   too much.

24         Here, let us not lose sight of the amount of this

25   award.  Ms. Noyes when she left her employment made $57,000 a

1    year.  The economic award here was about three times, she had

2    three years of pay in just economics, for a job that everyone

3    conceded at trial she would have lost shortly thereafter

4    because the whole place got shut down.  So we've got three

5    years of economics.  And then on top of that we've got the

6    $500,000 emotional distress award, which was based upon

7    Ms. Noyes's testimony that she may have seen a doctor a few

8    times, she might have gotten Xanax, and some other things,

9    but no history of treatment, no disability, nothing like

10   that, and she got an additional ten years of pay, nearly, for

11   that.

12          I would suggest, Your Honor, that is as clear evidence

13   from the jury of a punitive or quasi-punitive award as there

14   could be.  And given that there is this substantial emotional

15   distress award, on top of this substantial economic award,

16   neither of which appear to be justified from the testimony

17   given from the stand, but so be it, the award of the punitive

18   damages being nine times is far beyond that which is

19   constitutionally permissible under State Farm, under Gore,

20   and under Simon.

21          Thank you, Your Honor.  I'll reserve my other comments

22   for rebuttal, if I may.

23          THE COURT:  Okay.

24          MR. CONNAUGHTON:  Thank you.

25          MS. JONES:  Good morning.  On the managing agent

1   issue, I have reviewed those cases, of course.  The White

2   versus Ultramar case is the main case cited by the defense.

3          In that case the court -- it was a California Supreme

4   Court case where the court looked at the two ways of

5   evaluating a managing agent.  On the one side there were

6   courts of appeal saying that all it had to be was someone who

7   hired and fired that had the authority to do that.  And the

8   White court said, no, that's not enough, we need more, we

9   need to have someone higher up in the corporate hierarchy who

10  actually can establish policies.

11         In White versus Ultramar, the Court also discussed and

12  approved of the Kelly Zurian versus Wohl case, which I don't

13  believe was cited by either side; that's 22 Cal.App. 4th 397.

14  That case, the local boss was found not to be a managing

15  agent because he wasn't high enough in the corporation.  And

16  in that case the court specifically noted that the authority

17  to establish corporate policies rested in Saint-Louis, which

18  was the out-of-state corporate office.  That's exactly what

19  we have here.  The authority to make those policy decisions

20  rests in Troy, Michigan, where corporate headquarters is

21  located.

22         We're not seeking to pin our punitive damage award on

23  simply Ms. Ramsey, it's the corporation, through its

24  officers, directors, or managing agents, during the whole

25  period where the discrimination was allowed to take hold in

1      the Nevada City office.  And here it was Troy that had that

2      authority.  We've identified five corporate officers.  And I

3      don't believe that it's plaintiff's problem that there was

4      such a high turnover at the corporation where they would have

5      one person doing an investigation, Theresa Dolbert in '99,

6      with Tarek Brantley, who were no longer employed and out of

7      the subpoena power by the time this case came to trial, and

8      even in 2001 they were no longer involved in the Nevada City

9      operation.

10             The Supreme Court in White held that you do need more

11     than just the hire and fire.  So we have that here.  We

12     have -- in White it was just a district manager who reported

13     to department heads who managed eight stores and 65

14     employees, and they found her to be a managing agent under

15     Civil Code 3294 so as to authorize an award of punitive

16     damages.

17             We're going beyond that.  We have people who are

18     vice -- corporate vice presidents, such as Ms. Dolbert back

19     in Michigan.

20             The Cruz versus Home Base case, that one was another

21     one cited by defense for -- let's see, in that case a patron

22     was accused of stealing plywood by a security guard at Home

23     Base.  And the person they were seeking to pin the punitive

24     damages on in that matter was the manager of security of that

25     store, and there was insufficient evidence in that case for

1    ratification for the punitive damage award.  Clearly our case

2    has a different level of ratification.

3            College Hospital --

4            THE COURT:  What's the evidence of the ratification or

5    approval here?

6            MS. JONES:  Well, starting back in 1999, when the

7    letter was sent to David Beckstrand at the corporate office

8    to advise that there was some discrimination based on

9    religion.  After '99, when the corporate did the

10   investigation, they -- I believe they knew, or should have

11   known, that something was wrong in Nevada City, and they

12   failed to take steps to stop what William Heinz was doing

13   until it was too late, and they ended up closing the shop

14   completely.

15           They failed to -- let's see, so your question is

16   what's the evidence of the corporate ratification and

17   authorization of the acts?

18           THE COURT:  Yes.  Ratification or approval.

19           MS. JONES:  Or approval.  So that would have been

20   though any one of the corporate officers.  Theresa Dolbert

21   was a corporate vice president who was Mr. Heinz's boss, she

22   was the woman who came out in 1999.  Although she did not

23   testify at trial, we had evidence concerning that

24   investigation where people said, yes, I spoke with her, and

25   there was supposed to be a result given to us, and that was

1   never done.  So Theresa Dolbert is probably the highest

2   ranking corporate officer who was aware of the situation.

3         Nina Ramsey, of course, is the senior vice president

4   for human resources.  Although Kelly is claiming that people

5   like Darrah Bixler, who did testify, and Tarek Brantley, as

6   human resources generalists, were not sufficiently high

7   ranking enough, I believe under the cases cited by defense,

8   Cruz, College Hospital, White, the Kelly Zurian case, that

9   that's enough.  My client waited until the month after the

10  promotion, until Darrah Bixler was coming out to Nevada City,

11  to tell her what was going on.  This is the corporate

12  representative from headquarters coming out to discuss it.

13        Even though Nina Ramsey may not have been aware of the

14  situation until my client told her, even at that time when my

15  client told her there hadn't been a DFEH filing, there hadn't

16  been a lawsuit filed, the complaint was made, the situation

17  could have been taken care of, and it was not.  And there was

18  testimony on that issue at the trial.

19        The letter written in 1999 was to human resources as

20  well as corporate headquarters.  And I think when you really

21  examine these cases, you find that they're not really looking

22  for some higher level -- higher standard of corporate

23  managing agent ability to influence corporate policies.  I

24  mean, in that -- the White case there was simply a store

25  manager of eight stores and 65 employees who was a managing

 1    agent because that person had the ability to direct corporate

 2    policy right within each of those stores, a lot of authority

 3    was delegated to that person.

 4         We, I believe, have shown that there were sufficiently

 5    high-level corporate decision makers involved in the decision

 6    to not promote my client in April of 2001.  I mean, that's

 7    kind of the easy answer, that Kelly approved the promotion of

 8    Joep Jilesen.  That was approval, that was corporate

 9    approval.  And that they knew at that point, or should have

10    known, certainly, that there was discrimination going on.

11         We presented all of the evidence that this Court has

12    heard on the issues that were going on, and how the -- Kelly

13    corporate failed to take effective action to stop it.  And

14    that's exactly what the jury picked up on.  What it was was I

15    think going back to that time.  But, as well, my client had

16    tried to resolve the problem before filing a lawsuit, and

17    Nina Ramsey became aware of it then.  And, again, we don't

18    have control over whether or not corporate has a file that

19    goes from one person to another as the person holding that

20    job changes.  And I think there was a real lack of follow

21    through.  Darrah Bixler testified -- well, I'll strike that.

22         So, they had -- Kelly corporate's involvement was

23    pretty extensive in our opinion.  Even if they didn't know --

24    if they denied and put blinders on to the fact of religious

25    discrimination, they really should have given all the facts

1    and all the evidence that we presented, and what they knew,

2    and what they had been told, and how they had been made aware

3    of it through the exit interviews, through the letters,

4    through their own investigation in 1999.

5            The reprehensibility issue is another -- it's an

6    important issue, and they raised these new issues kind of in

7    their reply, that the emotional distress award includes the

8    punitive damage component.  And that, I guess, the

9    substantial -- I don't even know that -- because that word

10   has a certain weight to it, that it therefore cancels out the

11   punitive damage award.

12           Here the damages for emotional distress are very

13   reasonable.  And the trial was not bifurcated.  The jury knew

14   it had to decide both emotional distress and punitive

15   damages.  There was no reason, or logical explanation, as to

16   why the jury would decide to lump together some portion of

17   the punitive component into the emotional distress.

18           The evidence of emotional distress may have been short

19   but it was certainly compelling.  My client talked about the

20   loss of her management career after commuting to Sacramento

21   for seven years to get her MBA, and the jury put a very

22   reasonable value on that.  She talked also about how she felt

23   continuing to work there when she thought she was going to

24   get the promotion and she did not.

25           Remember, too, of course, that punitive damages are

1    not to compensate the plaintiff, they are to punish and deter

2    conduct such as this that occurred in this case.

3         When you look at cases that talk about a substantial

4    or -- I guess substantial compensatory damages that may

5    already contain a punitive element, those cases, the Simon

6    case, the amount of punitive damages was 340 times the

7    compensatory award, and in State Farm it was 145 times.

8    Those are different standards, and that may raise a suspicion

9    that I don't believe exists in this case.

10        Kelly is also making a claim, I guess, that its

11   reprehensibility is negligible or mitigated as a matter of

12   law because of their so-called legitimate factors, and that

13   goes to the mixed motive issue that he was arguing this

14   morning.

15        That argument doesn't work because they lost the trial

16   because the jury did not buy their reasons.  And they have

17   told us over and over again about these reasons, the

18   so-called legitimate business reasons including -- it's at

19   page 5 of their moving brief, again at page 16, that they

20   offered the job to Donna Walker, that Maya Bonhoff made an

21   independent recommendation, that there was management group

22   consensus.

23        I think many of those reasons actually added to

24   Kelly's reprehensibility in this case, because the

25   recommendation from Maya Bonhoff, we put on evidence it was

1    tainted, she didn't really know what was going on, she didn't

2    think Lynn wanted the job.  The management group consensus

3    was just a phantom consensus, that never really happened

4    either.  I think since the jury did find malice by clear and

5    convincing evidence, surely that should tip the scale in

6    plaintiff's favor on the reprehensibility issue.

7         We have the five factors discussed in BMW versus Gore,

8    which is -- or the BMW case talks about the five factors,

9    that State Farm notes that the absence of any one of these

10   may render an award suspect, but it's not unconstitutional

11   per se, you don't even need all five.  If you don't have any

12   of those factors you may still have a constitutional award,

13   it just needs to be looked at on a case-by-case basis.  And I

14   don't find those after the fact arguments very persuasive in

15   this context because Kelly had the opportunity to put that

16   evidence in, and the jury didn't agree with them; they found

17   that there was reprehensible conduct.

18        I guess the ratio -- there are the two issues, the

19   ratio and the reprehensible.  If I turn now to the ratio

20   issue, I believe that's been briefed fairly comprehensively,

21   but a nine to one ratio is not excessive.  It's at the top

22   range, but it's not excessive.  It's a single digit

23   multiplier.  And, of course, the Court has or will read the

24   State Farm case, which is the controlling case in this area,

25   and in that case it talks about punitive awards exceeding a

1   single digit multiplier to a substantial degree are suspect.

2   Ours isn't even exceeding a single digit multiplier.

3          So, the cases that talk about the two, or three times,

4   four multipliers, some of them -- the Buell case, in that

5   case the compensatory award was already so great that the

6   jury's award of 55 million was the reduced award.  The

7   numbers just get -- they get really large if you're looking

8   at the ratio and you have a large compensatory.

9          Our compensatory award is fairly reasonable given what

10   happened.  The ratio of the punitive damages to the

11   compensatory is also within constitutional provisions of the

12   due process clause as a single digit multiplier.

13          I hope that -- let's see.  The cases that we've

14   discussed, I think those -- there is also the Gelfo case that

15   they cited on the managing agent issue.  In that case there

16   was no corporate decision maker involved in the employment

17   decision, so it's insufficient evidence.  Here there is

18   evidence on both sides, and I believe it's substantial and

19   it's enough to support the award.

20          If the corporation itself did not have the integrity

21   to continue the investigation and to carry forth the

22   information they learned from '99 into the 2001 time period,

23   that's their fault.  And I think that's partly why they're

24   getting called to task for it, because they failed to take

25   steps to prevent what happened to my client, almost as an

1    inevitable result of the prior allowing of the discrimination

2    to flourish in the Nevada City office.

3            I've read Kolstad, it's been a while, so I can't

4    respond on that case.  I don't know, it wasn't in their

5    brief, but the -- I think that -- well, I'll just have to

6    leave that for now.

7            Did Your Honor also want to hear about the attorney's

8    fees, or are we going to handle that separately?

9            THE COURT:  You can argue that if you want to.

10           MS. JONES:  Did you have any other questions on the

11   constitutionality -- I think the managing agent issue is --

12   if you read the cases, we are clearly within the managing

13   agent, those five people that I've identified as corporate

14   officers, who had knowledge of what was going on.

15   Communication with the corporation was definitely taking

16   place.

17           I think we may have even had a claim that William

18   Heinz was a managing officer, but I didn't need that because

19   we have so many corporate agents from the Troy office, the

20   headquarters, that were aware of what was going on and

21   authorized, ratified, that behavior of William Heinz.

22           The attorney's fees, it's basically -- there are

23   many -- under Local Rule 54-293, there are many factors to be

24   considered, including the customary fee in contingency, and I

25   believe we've put on plenty of evidence to establish a

 1    reasonable lodestar.

 2          The multiplier, that's a little more difficult in

 3    federal court, but there is plenty of state law, which is

 4    applicable here.  The Court does have the discretion to

 5    enhance the award.  I do not believe the lodestar in our case

 6    is excessive.  If you look at the number of hours that were

 7    spent on this case, it's very modest.

 8          And nor are the hourly rates excessive.  We have put

 9    forth our declarations that say that that's what the market

10    rate should be.

11          There are three federal Court USDC cases cited by

12    defendant in their opposition, all three of those cases dealt

13    with the same disability attorney who would file lawsuits for

14    accommodations against fast food restaurants, and public

15    accommodations, drug stores, things like that, and the Court

16    seems to be in accord that that person's rate should be

17    limited to 250 for that type of work.  It's a lot of

18    boilerplate pleadings, they file -- I think he had, like, 40

19    cases going.  That's not my rate.  That's not how I'm

20    working.  So there is a lot of discretion in the award of the

21    fees, and I believe we've briefed that pretty fairly

22    comprehensively as well.

23          THE COURT:  Okay.

24          MS. JONES:  Thank you.

25          MR. CONNAUGHTON:  Thanks, Your Honor.  I'll just make

1    a couple of follow-up points.

2         Number one, it sounds like now the issue in response

3    to your question about what the approval or ratification was

4    now is that there were people at corporate who were involved

5    in the promotion decision.  I think that was the -- and I

6    believe that's belied by the record.

7         The record showed, and all of the testimony before

8    this jury was, that Mr. Heinz made the decision, in

9    consensus, if you believe him, with the people below him.

10   There was not evidence that people at -- somewhere at

11   corporate, certainly a managing agent, that made this

12   decision with him.  And that is another reason that shows why

13   this managing agent 3294 issue is so crucial.

14        It's not sufficient to just say Kelly corporate did

15   this, or these officers did that.  There needs to be

16   admissible, clear and convincing evidence of actual knowledge

17   by someone who could set corporate policy.  And there just

18   isn't that evidence before this jury, with the possible

19   exception of Ms. Ramsey, and the evidence as to what she did

20   shows absolutely no approval, absolutely no ratification, and

21   for that matter, and because of that, punitive damages, I

22   think, are inappropriate as a matter of law.

23        As to the follow-on issue regarding whether the

24   verdict was substantial, the judgment amount was substantial

25   or not, it's -- for the same exact theory, under the parallel

1    state and federal law, the amount is double the capped amount

2    if this were just a federal claim, same standards, same

3    everything else.  So I don't think there is a reasonable

4    argument that it wasn't a substantial verdict, because were

5    we just doing this under federal law it would be halved, just

6    the compensatory, as a matter of law.

7            Leaving that and just going to the attorney's fees

8    issue, the multiplier would be a windfall as a matter of law.

9    The standard rate in this district under all of the published

10   cases for experienced trial counsel is $250 an hour.  And I'd

11   also respectfully submit that the documentation submitted in

12   order to support the numbers is insufficient as a matter of

13   law, but that is obviously an issue for Your Honor's

14   discretion.

15           Thank you for your patience, Your Honor.

16           MS. JONES:  Just one more comment.

17           It is -- at the very, very least Nina Ramsey knew

18   about the discriminatory treatment when Lynn told her.  And

19   that was prior to filing any charges or any -- although the

20   promotion had already taken place, it was wrong, and she was

21   aware, she had been told that it was wrong.

22           I think there are still plenty of other officers that

23   were aware of what was going on.  Theresa Dolbert, Darrah

24   Bixler was the one who knew the most about what was

25   happening, and I think even as a human resources generalist

1   she had the ability to go back to her boss at headquarters

2   and influence corporate policy.  Notwithstanding defense

3   counsel's suggestions that she had no such power, there was

4   testimony that she counselled William Heinz on his job

5   employment decisions, that she -- she was involved.  She was

6   the corporate liaison person who had the ability.

7          You've got a big separation of -- you know, between

8   Troy and California, and the communications were not all that

9   common, but certainly in this case we have a number of

10  contacts with the corporation dealing with this issue of

11  discrimination prior to my client not getting the promotion,

12  and then after.  So there is -- there are five corporate

13  officers at the very least.

14         Thank you.

15         THE COURT:  The matter is submitted.

16         MR. CONNAUGHTON:  Thank you, Your Honor.

17                (Court adjourned, 9:37 a.m.)

18                        --o0o--

19

20

21

22

23

24

25

```
 1                        REPORTER'S CERTIFICATE

 2

 3                            ---oOo---

 4   STATE OF CALIFORNIA     )
     COUNTY OF SACRAMENTO    )
 5

 6        I, KIMBERLY M. BENNETT, certify that I was the Official

 7   Court Reporter, and that I reported verbatim in shorthand

 8   writing the foregoing proceedings; that I thereafter caused

 9   my shorthand writing to be reduced to typewriting, and the

10   foregoing pages constitute a complete, true, and correct

11   record of said proceedings:

12

13        COURT:   U.S. District Court

14                 Eastern District of California

15        JUDGE:   Honorable GARLAND E. BURRELL, JR., Judge

16        CASE:    LYNN NOYES vs. KELLY SERVICES, INC.

17        DATE:    JUNE 16, 2008

18        IN WITNESS WHEREOF, I have subscribed this certificate at

19   Sacramento, California.

20                           /s/ Kimberly M. Bennett
                             KIMBERLY M. BENNETT
21                           CSR No. 8953, RPR, CRR, RMR

22

23

24

25
```